IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Case No. 10 CR 298 |
| v. | ) |
| | ) Judge Virginia M. Kendall |
| ZARIFA PANTOVIC | ) |

**MEMORANDUM OPINION AND ORDER**

Defendant Zarifa Pantovic ("Pantovic") was charged in a three-count indictment with making false statements on joint federal income tax forms that she and her husband submitted for the 2003, 2004, and 2005 tax years in violation of 26 U.S.C. § 7206(1). Pantovic and her husband falsely represented the amount of income they received from their business, Momo Iron Works, located in Chicago. Pantovic moved to suppress statements that she gave to IRS claiming that she did not knowingly waive her *Miranda* rights during the custodial interrogation because her rights were read in English, not her native language of Yugoslavic of Croatian-Serbian dialect; and her statements were coerced in violation of her Fifth Amendment rights. For the following reasons, the Court denies Pantovic's Motion to Suppress.

**FINDINGS OF FACT**[1]

**I.    Civil Audit**

Between July 13, 2006 and February 19, 2008 a civil IRS agent met with Pantovic about seven times to conduct a civil audit of her business. (Tr. at 13). At the first two meetings, on July 13, 2006 and October 12, 2006, Pantovic's sister was present as her taxpayer representative and translated one or two statements for Pantovic during those meetings. (Tr. at 14-16). The October 12the meeting was the only one that involved a legal issue, specifically Pantovic's

---

[1] The following findings of fact are based on the evidentiary hearing that the Court held on this issue.

consent to extend the statute of limitations. During that meeting, her sister was present and translated for her. (Tr. at 15, 26).

The final meeting took place on February 19, 2008, during which the IRS agent examined Pantovic's bank records to determine business and personal expenses and income. (Tr. at 16). The interview began at Pantovic's business and continued at her house. (Tr. at 16, 27). When the agent was at Pantovic's house reviewing records, Pantovic freely moved around the house and was able to answer questions in broken English; she never asked the agent to further explain herself nor did she ever state that she did not understand a particular question. (Tr. at 17-18, 27-28). Because this was a civil audit and not a criminal investigation, the IRS agent did not advise Pantovic of her criminal rights. (Tr. at 20, 24, 31)

## II. Criminal Investigation

Based on the civil audit, the Internal Revenue Service's Criminal Investigation Division ("CID") initiated a criminal investigation into Pantovic's tax returns for the 2003, 2004, and 2005 tax years. (Tr. at 59).

On the morning of June 9, 2008, CID Agents Kristine M. Tice and Carissa D. Lyons visited Pantovic at her house. (Tr. at 41). Agents Tice and Lyons approached Pantovic, identified themselves as agents with the IRS criminal investigations division, and displayed their credentials. (Tr. at 42). The agents asked to meet with Pantovic but she informed them that she was leaving to pick up her father from the hospital; they all agreed to meet later that afternoon. (Tr. at 42). Agents Tice and Lyons returned around 1:00 pm and Pantovic allowed them into her house. (Tr. at 43). They all walked to the dining room table and before the interview began

Agent Lyons read Pantovic the following rights from a form titled "Non-Custody Statement of Rights":

> (At the outset of your first official meeting with the subject of an investigation, **identify yourself as a special agent of the IRS and produce authorized credentials.** THEN STATE:)
>
> "As a special agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses.
> "In connection with my investigation of your tax liability (or other matter) I would like to ask you some questions. However, first I advise you that under the 5th Amendment to the Constitution of the U.S., I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way. I also advise you that anything which you say and any documents which you submit may be used against you in any criminal proceeding which may be undertaken. I advise you further that you may, if you wish, seek the assistance of any attorney before responding.
> "Do you understand these rights?"

(Tr. at 44-45; Evid. Hr'g Ex. 1). Pantovic responded that she understood some, but not all, of the rights because her native language is Yugoslavic, Croatian-Serbian dialect. (Tr. at 46). Agents Lyons and Tice stopped the interview and Agent Lyons asked Pantovic for her telephone number, which she voluntarily provided, so they could reschedule the interview. (Tr. at 47). Without being prompted by Agents Lyons and Tice, Pantovic voluntarily provided information about her financial position as the agents were leaving her house. (Tr. at 47). During this initial meeting, Agents Lyons and Tice spoke in a calm, friendly manner and did not restrict Pantovic's movement or display their weapons. (Tr. at 47-48)

Agent Lyons talked with Pantovic over the phone to arrange the next meeting and Pantovic chose June 11. (Tr. at 48-49). Pantovic called Agent Lyons the day before the interview to reschedule and they agreed to meet on June 17. (Tr. at 51).

On the morning of June 17, CID Agents Lyons and Tice, along with Mario Ascic, a civil revenue agent serving as a translator, arrived at Pantovic's house. (Tr. at 52). Agent Lyons arranged for Agent Ascic to come because he spoke Pantovic's native language. (Tr. at 52). Agent Ascic is not a professional translator, but the IRS has used him as a translator in another case three times. (Tr. at 96).

When the agents arrived at the house they showed their credentials, Pantovic invited them inside, and they all proceeded to the dining room table. (Tr. at 52, 87). Once they were all sitting at the table, they began to read Pantovic the Non-Custodial Statement of Rights. (Tr. at 53). Agent Lyons slowly read the statement of rights in small pieces to Ascic, who translated it for Pantovic. (Tr. at 54, 89). After fully notifying Pantovic of her rights, Agent Ascic asked her if she understood these rights and she said yes. (Tr. at 54, 89-90). Based on Ascic's interactions with Pantovic from the moment he arrived at her house, he believed she fully understood her rights. (Tr. at 90, 122). Agent Ascic also testified that he truthfully and accurately translated the rights as well as each question and answer of the interview. (Tr. at 90-91). During the interview, Pantovic discussed a number of financial transactions relevant to the current criminal charges. (Tr. at 54)

Pantovic never asked the agents to leave or nor to stop questioning her. (Tr. at 92, 107-108). She got up from the dining room table multiple times during the interview to answer the phone or retrieve documents upstairs. (Tr. at 55). The conversation with Pantovic was calm and at no time did the agents yell or threaten her. (Tr. at 56-57, 91-92). Agent Ascic, who had direct interaction with Pantovic throughout the interview, noted that she never appeared confused, uncomfortable, or afraid, and was completely cooperative. (Tr. at 57, 90). She also

4

never told Agent Ascic he was speaking in the wrong dialect or provided any verbal or nonverbal signals that she misunderstood any part of the interview. (Tr. at 113-114, 122)

While CID Agents Lyons and Tice carried guns during the interview, they were carried underneath their clothing and were never displayed. (Tr. at 56). In fact, Agent Ascic never noticed that Agents Lyons or Tice were carrying guns during the interview. (Tr. at 98). After the interview ended Pantovic had a casual conversation with Agent Ascic unrelated to the subject of the interview and recommended that he try a certain restaurant. (Tr. at 94)

## STANDARD OF REVIEW

Pantovic contends both that she did not understand the waiver of her rights due to the language barrier and that the interview with Agents Lyons, Tice, and Ascic was coercive, and therefore she did not voluntarily waive her rights. In order to determine the proper standard to apply, the Court must first determine whether the interview was custodial. When a criminal suspect is "in custody" and faces "interrogation," law enforcement officers must notify him or her of the constitutional rights to counsel and self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006). "Custody" constitutes a situation where there is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Barker*, 467 F.3d at 628 (quoting *Miranda*, 384 U.S. at 444). The critical component of a custodial interrogation is the presence of coercion, namely where the suspect feels powerless to stop the conversation. *See United States v. Salyers*, 160 F.3d 1152, 1159 (7th Cir.1998).

**DISCUSSION**

Pantovic advances two arguments in her Motion to Suppress: (1) the June 17, 2008 meeting constituted a custodial interrogation and she did not voluntarily and knowingly waive her *Miranda* rights because of the language barrier; and (2) any evidence obtained during the June 17 meeting was the product of a coerced confession, which violated the Fifth Amendment Due Process Clause.

**I.     Custodial Interrogation and Waiver**

In determining whether Pantovic was in "custody" the Court looks to the totality of circumstances to determine if a reasonable person would have believed that he or she could have left the interaction with law enforcement. *See U.S. v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007); *Barker*, 467 F.3d at 928. One factor to consider is whether Pantovic herself believed sh was in custody when the agents were in her house. *Thompson*, 496 F.3d at 811. A reasonable person also would not feel coerced if the law enforcement agents did not raise their voices, display weapons, or physically restrain her. *Id.*; *see Beckwith v. United States*, 425 U.S. 341, 347 (1976) (IRS agents investigating defendant for tax fraud were invited into defendant's house, read his rights, and had a "relaxed" and "friendly" three-hour interview with him; did not constitute interrogation); *U.S. v. Mapp*, 561 F.2d 685, 688 (7th Cir. 1977) (defendant who was in familiar surroundings and under no physical compulsion and free to leave at any time did not constitute a custodial situation requiring *Miranda* warnings to be given); *United States v. Fitzgerald*, 545 F.2d 578, 580-81 (7th Cir. 1976) (IRS agents interviewing defendant in his home and gave warnings did not transform civil audit into criminal custodial situation).

Here, the June 17 meeting was not a custodial interrogation requiring the reading of *Miranda* rights. Pantovic cooperated with the agents to schedule the meeting and allowed them to enter her home. (Tr. at 59, 52, 87). In spite of the non-custodial nature of the meeting, Agent Ascic slowly translated for Pantovic all of her Fifth Amendment rights and the nature of the interaction was calm and polite. (Tr. at 47-48, 56-57, 91-92). While Agents Lyons and Tice wore guns to the interview, they were tucked under their clothes and never displayed. (Tr. at 56, 98). There was no indication that Pantovic ever felt uncomfortable during the questioning period, and in fact, after the interview she had a friendly exchange with Agent Ascic where she recommended that he try a certain restaurant. (Tr. at 57, 94). This investigative interview, which was done at the suspect's house included no elements of coercion or intimidation and as such was not "custodial." *See Beckwith*, 425 U.S. at 347; *Thompson*, 496 F.3d at 811.

Pantovic argues, however, that her waiver of rights was not knowing and intelligent because English was not her native language. ®. 19, Reply Mot. Suppress at 4). While the issue of *Miranda* waiver is appropriate only where, unlike here, the Court first finds that the defendant experienced a custodial interrogation, Pantovic's knowledge of her rights is relevant to whether the agents created an environment of intimidation and coercion. Pantovic contends that she did not fully understand her rights because her native language is Yugoslavic, Croatian-Serbian dialect, not English. The unrebutted testimony from the evidentiary hearing, however, is that Agents Lyons and Tice immediately stopped questioning Pantovic when she indicated that she did not fully understand the Non-Custody Statement of Rights that was read in English at the first meeting on June 9th. (Tr. at 47). After Pantovic told Agent Lyons that her native language was Yugoslavic, Croatian-Serbian dialect, Agent Lyons contacted another IRS agent, Mario

Ascic, to translate at the July 17th interview. (Tr. at 52). Before the interview started Agent Lyons slowly read Agent Ascic, in small parts, the Non-Custody Statement of Rights, and he translated this word-for-word for Pantovic. (Tr. at 54). After reading the rights, Agent Ascic asked Pantovic if she understood all of them and she said yes; her affirmative statement as well as her demeanor led Agent Ascic to believe that she fully understood all of the rights. (Tr. at 89-90, 122). While Pantovic did not hesitate to tell Agents Lyons and Tice on June 9 that she was having difficulty understanding the rights, she made no similar indication at the June 17 interview. Agent Ascic also testified under oath that he translated truthfully and accurately. (Tr. at 90-91) Finally, Pantovic never told Agent Ascic that he was speaking the wrong dialect. (Tr. at 113).

Pantovic's affidavit states that "I had never met the translating agent before and was forced to trust his translation," but there is no evidence before the Court that Agent Ascic's translation was deficient or inaccurate in any way. R. 29, Pantovic Aff. ¶ 9). Agent Ascic was not cross-examined at the hearing regarding his proficiency in translation. Agent Ascic did not read the Non-Custody Statement of Rights card, he relied on Agent Lyons to relay this information to him, but this does not undermine the effectiveness of his translation. While a language barrier can affect a defendant's knowing and intelligent waiver of *Miranda* rights, "the determination is not difficult when the suspect is advised of h[er] rights in a language that [s]he understands." *See, e.g., United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir. 1987) (defendant advised of rights in English and native language so waiver was knowing); *United States v. Saeed*, 08-CR-6087, 2009 WL 1147001, at *7-8 (W.D. N.Y. April 28, 2009) (same). The fact that Pantovic received an accurate translation of her rights in her native language is

another factor showing that her interaction with the agents on June 17 was not intimidating or coercive.

### B. Due Process Violation

Pantovic also maintains that her involuntary confession, which was the result of "improper psychological pressure," violates the Fifth Amendment's Due Process Clause. Pantovic relies on *United States v. Dickerson*, 413 F.2d 1111 (7th Cir. 1969), which held that the anxiety associated with an IRS criminal investigation is so great for the average citizen that full *Miranda* warnings are required. *Beckwith*, though, specifically overruled *Dickerson*: "The Supreme Court in *Beckwith* rejected the fundamental premise about the nature of an interrogation by tax agents which underlay our opinion[] in *Dickerson* []. The Court held that the prophylactic protection of Fifth Amendment rights which the *Miranda* warnings are designed to achieve is only required when 'the suspect has been taken into custody or otherwise deprived of his freedom in any significant way.'" *United States v. Fitzgerald*, 545 F.2d 578, 581 (7th Cir. 1976) (quoting *Beckwith*, 425 U.S. at 344). Unless an interview as part of a criminal tax investigation is otherwise coercive or intimidating, full *Miranda* warnings are not necessary. The Court examines the totality of the circumstances to determine if Pantovic's statements were involuntary. *See United States v. Serlin*, 707 F.2d 953, 956-57 (7th Cir. 1983) (involuntary confession where agent "affirmatively mislead[s]" defendant about the nature of the investigation with respect to material information that impacts the defendant's decision to speak with agents); *see, e.g., United States v. Knowles*, 2 F. Supp. 2d 1135, 1138 (E.D. Wis. 1998) (confession involuntary and inadmissible under Fifth Amendment's Due Process Clause where agents affirmatively misled defendant, telling him that he was not a suspect and would not be

9

arrested).  Moreover, "[s]imple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead." *Serlin*, 707 F.2d at 956.

Here, Pantovic argues that the agent never "formally" informed her that she was under criminal investigation.  The Non-Custody Statement of Rights, however, told Pantovic that the agents were investigating the "possibility of criminal violations of the Internal Revenue laws," and that they were going to ask her questions "in connection with [their] investigation of [her] tax liability."  (Evid. Hr'g Ex. 1).  Pantovic was aware of the potential for a criminal charge because she was advised that "anything which you say and any documents which you submit may be used against you in any criminal proceeding which may be undertaken."  (*Id.*).  It is unavailing for Pantovic to assert that she was "psychologically coerced" because she never knew she was under investigation.  Also, the agents never made affirmative statements that Pantovic would not be prosecuted, with the intent of deceiving Pantovic into providing incriminating statements.  *See, e.g., Serlin*, 707 F.2d at 956-57.  Finally, to the extent that Pantovic relies on the alleged coercive nature of the June 17 interview or the language barrier to assert that the circumstances constituted a due process violation, the Court rejects such an effort based on its ruling on the custodial interrogation issue.

## **CONCLUSION AND ORDER**

For these reasons, the Court denies Pantovic's Motion to Suppress.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 28, 2011